385 So.2d 1219 (1980)
Joy Howell THOMASEE, Plaintiff-Appellee,
v.
LIBERTY MUTUAL INSURANCE COMPANY et al., Defendants-Appellants.
No. 7580.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1980.
*1220 Bolen & Erwin, James A. Bolen, Jr., Alexandria, for defendants-appellants.
Whitaker & Doggett, John B. Whitaker, Natchitoches, for plaintiff-appellee.
Before FORET, SWIFT and STOKER, JJ.
STOKER, Judge.
This is a suit by plaintiff, Mrs. Joy Howell Thomasee, for workmen's compensation benefits against her former employer, the City of Natchitoches and the city's workmen's compensation insurer, Liberty Mutual Insurance Company.
At the time of her injury plaintiff was employed by the city in various capacities as a cashier collecting utility payments and as an accounts receivable clerk. On January 9, 1979, the United States Post Office in Natchitoches was being temporarily used as the City Hall. Plaintiff was leaving work at approximately 8:00 P.M. and was to ride home with a fellow employee. The co-employee's automobile was parked in the Police Jury Parking Lot across the street from the post office. The city employees who were temporarily working in the Post Office Building had been requested to park there in order to leave sufficient parking on the streets. On her way to the car it was necessary that Mrs. Thomasee climb twelve to twenty steps that led to the parking lot. This parking lot was elevated above street level because it had once been the foundation of St. Mary's High School in Natchitoches. These old steps which had once led to the school were broken and uneven, and there was no handrail.
As plaintiff ascended these steps she slipped and fell, and, in an attempt to break her fall, she injured the wrist on her left arm. After this injury on Tuesday, plaintiff missed work until the following Monday. She continued to work for the City of Natchitoches until she was fired on April 6, 1979. Her attorney wrote the city concerning her workmen's compensation claim on April 9. Suit was filed on June 7, and trial was on July 9. The trial court awarded plaintiff workmen's compensation of $91.66 per week, two-thirds of her average weekly wages of $550.00 per month, beginning on April 19, 1979, and continuing during the period of disability which disability was judged to be total and permanent.
Defendants make three assignments of error:

*1221 "ASSIGNMENT OF ERRORS
"1. The Trial Court erred in finding that the plaintiff's accident occurred within the course and scope of her employment for the City of Natchitoches.
2. The Trial Court erred in finding that the injury to the plaintiff's left wrist disabled her from performing the duties required of her as a cashier or clerk thus causing her to be entitled to workmen's compensation on a total and permanent basis.
3. The Trial Court erred in finding that the injury to the plaintiff's left wrist disabled her from engaging in any gainful occupation for wages."
We will deal with each of these issues as they have been raised by defendants.

I.
Did plaintiff's accident occur within the course and scope of her employment for the City of Natchitoches?
R.S. 23:1031, states:
"If an employee not otherwise eliminated from the benefits of this Chapter, receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation in the amounts, on the conditions, and to the person or persons hereinafter designated."
Malone and Johnson, in their recently published treatise on workmen's compensation,[1] state:
"The courts have consistently stated that an accident that befalls an employee while he is going to or returning from work does not occur in the course of his employment."
An important exception to this rather stringent rule is contained in the "threshold doctrine". Under this doctrine an employee who meets with an accident outside the employer's premises while going to or coming from work can recover if he can prove there exists (1) a distinctive travel risk for the employee in going to or coming from work, and (2) this risk exists in an area immediately adjacent to his place of work.[2]
The Louisiana Supreme Court in explaining the requirement of a distinctive travel risk in Templet v. Intracoastal Truck Lines, Inc., 255 La. 193, 230 So.2d 74 (1969), said the risk must be one "to which the employee is regularly and peculiarly exposed by reason of his employment to which the public generally, albeit also subjected to such hazard, is not usually exposed to the extent of the employee."
Professors Malone and Johnson expound on this issue in their treatise in Section 169 at page 353:
"In order that the `threshold doctrine' should apply, it is not necessary that the dangerous approach where the accident occurred should be the only available means of access to the premises. If it is a customary approach, this is enough. In Doyle v. Penton Lumber Co.,[3] for example, the court applied the doctrine to a worker who elected to walk down the railroad track rather than use the slightly longer road leading to the customary entrance to his employer's plant. The court relied upon the fact that the deceased frequently used this approach with the knowledge of his employer, even though the use of the track was not customary among other workers."
The trial court found that the plaintiff in the present case "was exposed to descending and ascending the parking lot steps on a daily basis, going to and from the parking lot across the street to the Post Office ..." The court concluded "that a distinctive travel risk for the plaintiff existed in going to and from the Post Office to the parking lot." From the evidence in the record we cannot say that the trial court was clearly wrong in these findings.
*1222 Plaintiff testified that the steps were very old, having led to a high school which had been torn down. Her testimony indicated that about half way up the steps were broken all the way across, and "they're off-set a little bit." She further testified that "there's one [step] that is shorter. And that's what I tripped on." There was no handrail.
Plaintiff's boss, Deborah Manning, who was employed as Director of Finance by the City of Natchitoches, testified that the city employees had been instructed to park in the Police Jury parking lot while their offices were temporarily in the Post Office. Manning approximated the number of steps as roughly twenty. Plaintiff, Thomasee, testified that the city employees "had been told to park in the Police Jury parking lot." She added that, although there are several entrances to the parking lot, the steps on which she fell are the nearest available route and the one most of the employees of the City Hall used.
In light of these facts we find no manifest error in the trial court's holding that the steps upon which plaintiff was injured comprise a distinctive travel risk to plaintiff, thus meeting the first requirement for application of the threshold doctrine.
The second requirement for application of the threshold doctrine is that the distinctive travel risk exist in an area immediately adjacent to the employee's place of work. The parking lot is located, in the words of the trial court, "immediately adjacent to her place of work," with "the steps ... as close as physically possible to the City of Natchitoches' offices."
We find no manifest error in this finding of the trial court. We find that the steps were immediately adjacent to plaintiff's place of employment. Thus, the second requirement for application of the threshold doctrine has been met, so its application was proper.

II.
Did the Trial Court err in finding that the injury to the plaintiff's left wrist disabled her from performing the duties required of her as a cashier or clerk thus causing her to be entitled to workmen's compensation on a total and permanent basis?

and

III.
Did the Trial Court err in finding that the injury to the plaintiff's left wrist disabled her from engaging in any gainful occupation for wages?
Plaintiff testified that her arm began to hurt her on the night of her accident after she had arrived home from work. The next day she went to Natchitoches Parish Hospital and the following day to an orthopedic specialist in Shreveport, Dr. E. Lee Etheredge. On May 3, 1979, plaintiff changed physicians, after Dr. Etheredge said he had done all he could and could not understand her lack of improvement. He suggested she get a second opinion. She then began to see Dr. Lewis C. Jones who was still seeing her at the time of the trial. Medical evidence in this case consists of seven progress reports of Dr. Etheredge and the deposition of Dr. Jones.
Plaintiff testified that following the accident she worked in pain and was required to take strong pain tablets that made her sleepy. At the time of trial Dr. Jones had given plaintiff a leather type splint to wear around her wrist and forearm, which she testified she wore four hours a day and at night. He also placed her on medication, being Clinorial, an anti-inflammatory medication and Elavil, a mood elevator. Dr. Jones diagnosed Mrs. Thomasee's problem as tenosynovitis of the distal radio-ulna joint in her left wrist, or in lay terms, inflammation of the tendons about the joint at the end of the forearm of the left wrist. He had initially placed her in a long arm cast for three weeks.
Defendants made much of several statements by Dr. Jones in his deposition. He stated that "as far as any specific objective findings, I didn't really find any particular *1223 evidence of abnormalities, such as discoloration or some logicalphysical deformity."
In the course of testimony by deposition given by Dr. Jones the following question and answer resulted.[4]
"Q. * * * I would like to know, as of this time, what percentage of physical impairment would you give her for that left upper extremity?
A. It would strictly be on a almost subjective basis, for the complaints of pain. I don't have any good objective evidence to give her an impairment other than on pain."
And again, in response to an inquiry posed by defense counsel, the following exchange took place.[5]
"Q. * * * Again, your examination of herthere was nothing objective that you could find wrong with her; is that correct?
A. That is correct."
These statements of Dr. Jones are very persuasive for the cause of defendants, but of even more significance are some of the doctor's other statements:[6]
"* * * I feel that her pain, to a large degree, is real." "* * * I would say, thirty-five to forty percent of temporary physical impairment."
In answer to the question:[7]
"Do you feel that her pain is real, in your professional opinion?"
Dr. Jones replied, "The pain she experiences is real."
When the attorney for the plaintiff stated that he wanted to get down to the "bottom line" this dialogue followed:[8]
"Q. * * *
Do you think that Mrs. Thomasee was faking her injury, or her pain?
A. I don't think that she was faking the injury. I don't think that she was deliberately faking the pain, or even pretending that she was having the pain.
As I stated earlier, I think the pain of the patient, which she is experiencing is real."
An appellate court may not disturb a finding of fact by a district court unless it appears that the finding is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). The statements of Dr. Jones, Dr. Etheredge, and the plaintiff pertaining to her injury, when read along with the rest of the record, indicate that the determination of the district court that plaintiff is disabled was not clearly wrong.
Dr. Etheredge's seven reports show Mrs. Thomasee was in pain, and she was required to wear splints and take medication during the time she saw him from January 11, 1979, through April 18, 1979. The doctor's last report indicated Mrs. Thomasee was having trouble with typing and key punch. When she began seeing Dr. Jones he continued her in a splint and found her to have tenderness to palpation over the dorsum of the distal radio-ulna joint of the wrist, more simply described as an inflammation of the tendons and synovia about the joint. This inflammation was found to be located in the joints at the end of the forearm at the wrist. Dr. Jones had prescribed and continued to prescribe Clinorial, to decrease inflammation, and Elavil, a mood elevator. In addition she was referred to a physiotherapist, and a transcutaneous neurostimulator was prescribed for her. This was a cumbersome device which Mrs. Thomasee attached to her arm at night. It sent out electric shocks that eased the pain to allow plaintiff to sleep.
As we have noted Dr. Jones estimated that plaintiff's pain caused 35 to 40 percent temporary physical impairment. It was based on these facts that the trial court determined that plaintiff was disabled from *1224 performing her job for the City of Natchitoches. The court awarded workmen's compensation "on a total and permanent basis." This was the proper award since the courts have said that it is a permanent and total disability when one cannot work without substantial pain. Phillips v. Dresser Engineering Co., 351 So.2d 304 (La.App. 3rd Cir., 1977), writ denied 353 So.2d 1048 (La., 1978); Rachal v. Highlands Insurance Co., 355 So.2d 1355 (La.App. 3rd Cir., 1978); Jones v. Arnold, 371 So.2d 1258 (La.App. 3rd Cir., 1979) and Whitaker v. Church's Fried Chicken, Inc., Docket Number 65,401, Louisiana Supreme Court, April 7, 1980.
For the above and foregoing reasons the action of the trial court is affirmed. All costs of this appeal are assessed against the defendants-appellants.
AFFIRMED.
SWIFT, Judge, dissenting.
I must respectfully dissent from the majority's decision as I am not convinced that the plaintiff was exposed by her employment to any distinct risk to which the public was not exposed generally. Templet v. Intracoastal Truck Lines, Inc., 255 La. 193, 230 So.2d 74 (La.1969).
NOTES
[1] Malone and Johnson, Workers' Compensation Law and Practice, 13 Louisiana Civil Law Treatise, Section 168 p. 344.
[2] Id., Section 169 at p. 350.
[3] 56 So.2d 774 (La.App. 1st. Cir., 1952).
[4] Deposition of Dr. Lewis C. Jones, p. 15, lines 5-11.
[5] Id., p. 27, lines 9-12.
[6] Id., p. 15, lines 12 and 16-17.
[7] Id., p. 15, lines 21-23.
[8] Id., p. 36 beginning at line 23 and extending through p. 37, line 4.